SMYTH v. NEW ORLEANS CANAL & BANKING CO. et al.

(Circuit Court of Appeals, Fifth Circuit. March 14, 1899.)

No. 676.

1. EVIDENCE—ANCIENT RECORDS—SUFFICIENCY OF AUTHENTICATION.

To prove a French grant of land in Louisiana, claimed to have been made in 1757, and by a second confirmatory grant in 1764, there were offered in evidence from the proper custody a number of sheets from a record book, of ancient appearance, whose edges and corners had been burned, bearing watermarks and stains, and containing, in a more or less legible French writing, what purported to be the proceedings relating to such grants, including the formal grants themselves. It was shown historically that there existed as a part of the Spanish archives of the province of Louisiana a series of books, called "registers of grants," containing records of grants or concessions of lands in the province by both the Spanish and French authorities, and that such books, on the cession of the territory, were transferred to the authorities of the United States, and subsequently became, and were made by law, a part of the records of the land office at New Orleans, and that there was a fire in such land office in 1865, in which the greater part of the records were destroyed, and the remainder damaged by fire and water. The sheets offered were identified as a part of one of the books rescued from such fire in a damaged condition. There was further offered in evidence a certified copy of each of said grants, made by the register of the land office at New Orleans in 1854 and 1855, respectively, and a certified copy of the original grant of 1757, made by the secretary of the Spanish colonial governor in 1795. These copies corresponded with each other as to the pages of the record from which they purported to have been made, and in their contents with each other and with the sheets offered in evidence. *Held*, that such sheets were sufficiently authenticated to render them admissible in evidence.

2. SAME—FRENCH GRANT OF LANDS—SUFFICIENCY OF PROOF.

Such sheets, together with the certified copies, constituted sufficient evidence that the grants therein referred to were made.

3. SAME—ANCIENT DOCUMENTS—PROOF OF OFFICER'S SIGNATURE.

The signature to a certificate, purporting to have been made in 1795, which recites that the signer is the secretary of the Spanish government of the Louisiana colony, and that the paper to which it is attached is a copy of a public record in his custody as such secretary, will be presumed genuine, where it is historically known that the person whose name is signed was such secretary at the time, and is fully authenticated by the testimony of experts, showing its genuineness by comparison with the signatures to other documents executed by such officer before a notary public.

4. SAME—RECORD OF FRENCH GRANT IN LOUISIANA.

The fact that a French grant of lands in Louisiana was dated in 1764, after the cession of the territory to Spain, does not render the record of such grant inadmissible as an evidence of title, as it may be shown to have been ratified or recognized by Spain, or by France after again acquiring possession.

5. EJECTMENT—ISSUES—MATERIALITY OF EVIDENCE.

In ejectment, where proof of a prior grant, pleaded by defendant, would of itself render plaintiff's claim of title invalid, the failure of defendant to connect his own title with such grant is immaterial; and the admission of incompetent evidence offered for that purpose by defendant is not prejudicial to plaintiff, who can only recover upon his own title.

6. EVIDENCE—SURVEY—OFFICIAL RECOGNITION.

The Trudeau survey of a tract of land near New Orleans, made in 1791, if not originally of an official character, has become so by its repeated recognition by the authorities of the United States in dealing with lands affected thereby, and, being among the records of the land office at New

Orleans, when produced by the officers having it in custody, is admissible in evidence, together with the procès verbal thereof.

7. FRENCH AND SPANISH LAND GRANTS IN LOUISIANA — NECESSITY OF CONFIRMATION.

Grants of lands in Louisiana, made by the former sovereigns, which were perfect and complete at the time of the cession of the territory to the United States, did not require confirmation by this government to give them validity or entitle them to recognition by the courts of the United States. The various acts of congress relating to the confirmation of such grants applied only to those which were inchoate or had not been perfected.

8. EVIDENCE—ANCIENT WILL—PROOF OF PROBATE.

A will under which possession of valuable lands has been held, improvements made, and other acts of ownership exercised for a hundred years, will be presumed to have been duly probated, and is admissible in evidence as a muniment of title without proof of such fact.

9. PUBLIC LANDS—SURVEYS OF FOREIGN GRANTS.

The secretary of the interior, on a final determination in favor of the validity of a French or Spanish grant of lands in Louisiana prior to its cession to the United States, has authority to set aside former surveys of the land made by the land department, and to cause a new survey of the grant to be made; and this action is conclusive on the courts, so far as relates to the location and boundaries of the grant fixed by the survey, though not as to its validity or its binding effect under the treaty of cession.

10. EJECTMENT—DEFENSE—RIGHT TO ATTACK VALIDITY OF PATENT.

It is open to a defendant in ejectment in a federal court to defeat the plaintiff's title, derived through a patent or grant from a state, by proving that the state was without jurisdiction to make such conveyance or grant, as that it had no title or right to the lands; and where plaintiff claimed under the state of Louisiana, which in turn claimed title through the swamp-land grants of congress, proof that the lands had been the subject of a valid and completed grant by the French authorities, while the sovereigns of the country, and had been claimed and held under such grant ever since, and hence never became public lands of the United States, constitutes a complete defense to the action.

11. TRIAL—DIRECTION OF VERDICT.

When the evidence given at the trial, with all the inferences which the jury could justifiably draw from it, is insufficient to sustain a verdict for plaintiff, the court may properly direct a verdict for defendant.

In Error to the Circuit Court of the United States for the Eastern District of Louisiana.

J. R. Beckwith, J. Ward Gurley, and D. C. Mellen, for plaintiff in error.

J. L. Bradford and Branch K. Miller, for defendant in error New Orleans & Canal Banking Co.

J. P. Blair and Geo. Denegre, for defendant in error New Orleans City & Lake Ry. Co.

Girault Farrar and Gustave Lemle, for defendants in error Illinois Cent. R. Co. and Yazoo & M. V. R. Co.

Before PARDEE, Circuit Judge, and BOARMAN and SWAYNE, District Judges.

SWAYNE, District Judge. The plaintiff in error, Andrew W. Smyth, who was the plaintiff below, brings this cause here upon a writ of error from the circuit court of the United States for the Eastern district of Louisiana, to recover certain real estate situate in said district.

The petition avers that said plaintiff is the lawful owner of lands in township 12 S., range 11 E., Southeastern land district of Louisiana, east of the Mississippi river, describing it as follows: Sections 8, 15, and 17; lots, 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10, in section 20; sections 22, 25, and 28; lots 6, 7, 8, 9, 10, and 11, in section 29; and sections 30, 31, 32, and 33,—alleged to contain in the aggregate 2,295 acres; also lots 11 and 12, in section 20, and lots 1, 2, 3, and 4, in section 29, alleged to contain 19,659 acres more; the total amount being 2,357.87 acres. And the petition further avers that the New Orleans Canal & Banking Company (now the Canal Bank) claims to have had title to nearly all of said lands under pretended copies of alleged concessions made by French authority to Louis C. Le Breton on October 6, 1757, and on February 15, 1764, and has from time to time sold the certain designated portions to the other defendants named in the petition,—the Metairie Cemetery Association, the New Orleans City & Lake Railroad Company, the Illinois Central Railroad Company, the Louisville, New Orleans & Texas Railroad Company, and George L. Bright, who are wrongfully in possession, and claiming the designated respective portions of said land under and by virtue of purchases made by them from the New Orleans Canal & Banking Company, which last-named company is wrongfully in possession of most, if not all, of the other portions of said land. And the petition proceeds to aver that these lands are within and a part of the province of the territory of Louisiana which passed to the United States of America under and by virtue of the treaty of Paris on the 30th day of April, 1803, between the French republic and the United States of America; that by the acts of congress approved March 2, 1849, and September 28, 1850, said lands were granted, selected, and duly listed to the state of Louisiana; that on the 22d day of June, 1872, an official survey of the said lands was approved by the surveyor general of the United States, and the said lands were subsequently listed as swamp lands, inuring to the state of Louisiana in accordance with the said acts of congress; that on the 11th day of July, 1873, the plaintiff acquired the said lands by purchase from the state of Louisiana, and subsequently, on the 5th day of January, 1882, plaintiff located, under act of congress of May 20, 1826, indemnity school warrant No. 3,778, N. S. D., on lots 11 and 12 of section 20, and lots 1, 2, 3, and 4 of section 29, and received certificate of purchase No. 1,230, N. S. D., and patents Nos. 1,873, 1,889, and 1,890, issued by the state of Louisiana, and also state warrant and certificate of location, dated January 5, 1882, from the United States land office at New Orleans; that the patents so issued to the plaintiff covered 1,494.85 acres of said lands, and the patents for the remainder of said lands were withheld by decision of the land department of the United States on the 9th day of November, 1887, until the validity of said alleged French grants set up by the defendants should be determined. The petition then proceeds to aver that if the said pretended French grants ever existed, which is denied, they were incomplete, invalid, and of no force or effect under and by virtue of the treaties made between this and the French government, and that the defendants have no rights under said alleged grants, nor any title emanating therefrom. The instant

suit, as set forth in the petition, is against the following defendants, and for the following lands: (1) The Canal Bank, for sections 8, 15, 17, and lots 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 of section 20; sections 22, 25, and 28, and lots 6, 7, 8, 9, 10, and 11 of section 29; sections 30, 31, 32, and 33; or for such portions thereof as were not alleged to be in the possession of the other defendants, viz.: (2) The Metairie Cemetery Association, for "a portion of sections 20 and 29." (3) The New Orleans City & Lake Railroad Company, for "portions of sections 8, 17, and 20." (4) The Illinois Central Railroad Company, for "lot 2 of section 33, and portions of sections 29, 30, and 32." (5) The Louisville, New Orleans & Texas Railroad Company, for "portions of sections 31 and 32." (6) George L. Bright, for "portions of lots 1, 2, 3, and 4 of section 29." The petition further avers that the dispute between the plaintiff and defendants, relative to the validity of plaintiff's title to said land, arises under the constitution and laws of the United States and the French republic, and the interpretation of the laws of the United States and the treaties made under authority thereof, and the plaintiff's title to the said lands is necessarily involved in the determination of the issues in the case; that the defendants are without title to said lands, or any part thereof; that all claims set up thereto by them are illegal, null, and void, and operate as a cloud on petitioner's title, and cause him great damage, loss, and injury; and the plaintiff prays for a judgment, recognizing the validity of his title, and canceling all the alleged claims of defendants, and condemning them to deliver possession of the lands to the plaintiff.

The answer of the New Orleans Canal & Banking Company, after pleading the general issue, set up the validity of the two grants of the French government attacked by the plaintiff. In detail it set out the history of its title. It declared that in the year 1732, one De La Freniere petitioned Bienville and Salmon, then respective governor and commissary director of the province of Louisiana, and the proper authorities of the king of France in the colony, for the grant of a "vacherie," or large extent of land along Bayou De La Metairie, having about 53 or 54 arpents thereon, and extending in depth about 50 arpents to the shore of Lake Pontchartrain; that this petition was granted on or about October 25, 1738, on condition that part of the land petitioned for, being that towards the west, having 12 arpents front on the bayou, should belong to the succession of one Beaulieu; that the applicant, De La Freniere, then owned a plantation on the Mississippi river of the usual depth of 40 arpents, and that the object of his application was manifestly to obtain land in its rear for the purpose of pasturing; that it originally had acquired and held in good faith nearly all the land in controversy, under two complete, valid French grants, made to Louis C. Le Breton, one October 6, 1757, the other February 15, 1764; that the grant of 1764 was a confirmation of a grant of the same land, made in 1738, to one De La Freniere, of the Vacherie tract proper, having 53 or 54 arpents in width east and west, and 60 arpents in depth north and south, extending to Lake Pontchartrain; that the grant of 1764 was also a regrant or confirmation of the grant of 1757, which included the triangular tract in the rear of the plantations on the river, and extending in depth to the

southern limits of the Vacherie tract; that these were public, notorious grants, duly severed from the domain of France and Spain, respected by the public colonial authorities of both those governments, and made the bases of many sales and transfers by or before some of them, the chief of which sales, etc., constituting the chain of title in the bank, are minutely set forth; that the survey of such lands by Bulakowski as public lands of the United States was "utterly erroneous and illegal ab initio," and had been, in appropriate proceedings, taken contradictorily with the state of Louisiana and plaintiff, so held by the interior department of the United States, and said survey annulled and set aside, and said grants by said authority duly surveyed and located; that said lands were not swamp and overflowed, but chiefly high and fit for cultivation; that canals, shell roads, racetracks, cemeteries, riding parks, etc., covered much of them; that said lands were not lands of the United States, swamp or high, when the swamp-land grants to the state were made in 1849 and 1850, and hence did not pass to the state under said grants; that if they did so pass, or any part thereof, the alleged sales to plaintiff of the same as tidal overflow lands, at 25 cents per acre, were null and void; that the selection of said lands as swamp land, inuring to the state under said grants of 1849 and 1850, had all been canceled and annulled by the secretary of the interior; that as to lots 11 and 12 of section 20, and lots 1, 2, 3, and 4 of section 29 (the Metairie racecourse and cemetery tract, containing 196.59 acres), the pretended location thereon of a school warrant was void, and had been so declared by the secretary on valid grounds, etc. Finally, the answer pleaded the prescriptions of 10 and 30 years, supported by 150 years' peaceable possession under just titles, etc., by the bank and its authors and vendees.

The bank, by first supplemental answer, filed April 17, 1895, pleaded the federal survey of the grants of 1757 and 1764, made by the United States in 1884. It also pleaded title to part of the land sued for under a grant made by Spain to J. B. Macarty, December 22, 1795, with confirmation by the United States, setting forth its deraignment of title thereunder; also under a grant or sale of the Jesuits' property, made by France, August 18, 1763, and likewise setting forth its deraignment of title under the same; alleged that all these grants—to Le Breton in 1757 and 1764, to Macarty in 1795, and of the Jesuits' lands in 1763—"were perfect grants, accompanied by surveys and possession under all the governments of the province prior to the cession of Louisiana to the United States, and were in full force of recognition by all at and prior to said cession, and fully protected by the treaty between the United States and France, and said land has been owned and possessed in good faith by this defendant and the authors of its title, based on said original grants and titles, for more than a century." It concluded with the plea of 10 and 30 years' prescription under Rev. Civ. Code, arts. 3478, 3499.

The second supplemental answer of the bank, filed March 7, 1896, alleges that it built the new basin canal and shell road through the lands in controversy, under the act of the Louisiana legislature of March 5, 1831, and used and enjoyed the same for 35 years, when

they reverted to the state in 1866, and have since been in the possession and enjoyment of the same, which state has treated the petitions of plaintiff to be the same as void, and that it never advanced the same against the state; that the property along said canal has for 50 years been in the possession in good faith of the bank's vendees, who have built barrooms, hotels, clubhouses, racetracks, cemeteries, etc.; that other portions of the land, sued for and described under the illegal and void Sulakowski survey as sections, lots, townships, etc., form the squares and the streets of the town of Carrollton, and have been inclosed, improved, and built upon by the bank's vendees, and in their undisturbed possession for 50 years; that the Metairie Cemetery tract was sold by the bank over 50 years since, and has ever since been in the possession of the Metairie Association and its authors in title, as the principal place of burial for the city of New Orleans; that the Oakland Riding Park tract, acquired by the bank under the grants aforesaid, had been, 30 years before, sold to George L. Bright and Jacob Williams, and used by them since as a racetrack, having been, for 60 years before the treaty of cession, in the continuous actual possession of the bank's authors in title; that all the lands sued for by plaintiff have been sold by the bank from time to time, and that, in addition to the 70 years' possession of same by the original grantees and those holding under them, the bank and its own vendees had been in possession for over 60 years; that the nature and use to which the land had been put showed that it was never swamp or overflowed land, and the foreign grants of same, and possession under them, showed that no portion of it was legally subject to the surveys, selections, locations, and entries set up by plaintiff; and that all such were utterly unfounded and void. This answer, like the two preceding ones, concludes with averring the ancient possession and enjoyment of the lands by its authors in title, by the bank and its own vendees, and concludes with the plea of 10 and 30 years' prescription under the Code.

To the intervention of the Howcott Company the bank filed an answer and exception April 17, 1895. The answer set forth the title and possession of the bank to the particular tract patented by the state to Howcott,—part under the grant by Spain to Macarty of 1795, and a part also under the sale or grant in 1763 to Joseph Petit of the Jesuit land, stating its derivative chains of title under both. The plea was that of 10 and 30 years' prescription; also that, if intervener had any title, he should enforce it by suit against plaintiff or defendant, and not both. Plaintiff likewise excepted to the intervention, and by order of the court, December 22, 1896, the two exceptions were referred to the merits.

June 29, 1896, the Illinois Central Railroad Company and the Yazoo & Mississippi Valley Railroad Company also filed their joint answer to the intervention, setting up the same matters of defense pleaded by them to the petition of plaintiff. These and the bank were the only defendants who thought the claims of the Howcott Company affected them. The other defendants, therefore, did not answer it.

George L. Bright answered November 5, 1894, denying the allegations of plaintiff, alleging that he purchased the land claimed of him from the bank, which was bound to warrant his title, and concluded by adopting the answer filed by the bank.

The Yazoo & Mississippi, Valley Railroad Company, November 24, 1894, answered, pleading the general issue, and likewise adopting the answer of the bank.

The Illinois Central Railroad Company, November 24, 1894, filed a plea of prescription of 10 years, under Rev. Civ. Code, art. 3478, averring that it was in possession of the land it was sued for, and with its authors in title had been since March 17, 1877, paying taxes, etc., on the same; that the same was sold at marshal's sale on that day in the suit of J. B. Alexander and others against the New Orleans, Jackson & Great Northern Railroad Company, No. 7,789 of the docket of the United States circuit court, Eastern district of Louisiana, which sale was duly confirmed, etc.; that the purchaser at said sale transferred, through mesne conveyances, the said land to the Chicago, St. Louis & New Orleans Railroad Company, who leased the same to the Illinois Central Railroad Company for 400 years; and that it was in possession under said lease, etc. This plea was referred to the merits May 19, 1896.

The Metairie Cemetery Association filed answer November 30, 1894, pleaded the general issue, admitting. it was the owner and in possession of certain lands acquired by an act of sale of July 23, 1872, filed as part of the answer, and averring that it held the same by derivative titles under the Canal Bank, and finally pleaded the defenses set up by the same in its answers.

George L. Bright, March 9, 1897, filed his supplemental answer, pleading the prescription of 10, 20, and 30 years, and adopting the supplemental answer of the bank filed March 7, 1896. This was afterwards changed to read 10 and 30 years' prescription, instead of 10, 20, and 30 years'.

The Metairie Cemetery Association filed its amended answer March 11, 1896, adopting the supplemental answer of the bank of March 7, 1896, deraigning title under the sale made by the bank, April 15, 1851, to Richard Ten Broeck, and averring it to be a part of the foreign grants under which the bank claimed title, and that it had long been in the continuous and undisturbed possession and enjoyment of the bank, its authors in title, and its vendees, and pleading the prescription of 10 and 30 years.

December 30, 1895, the Canal Bank was substituted as defendant in the place and stead of the New Orleans Canal & Banking Company.

May 16. 1896, the Illinois Central Railroad Company filed an amendment to its plea of prescription of 10 years, setting up matters of fact in support, viz. that it was in possession of lot 2 of section 33, and portions of sections 29, 30, and 32, as lessee of the Chicago, St. Louis & New Orleans Railroad Company, and that said lot 2 of section 33 composed squares and parts of squares 533, 542, 543, 562, and 563 of the city of New Orleans. The plea then showed how the lessor company became the owner of said squares, and

averred that ever since 1852 and 1857 said lessor and its transferees had been in the exclusive public and peaceable possession of the same, paying taxes, etc.; that the New Orleans, Jackson & Great Northern Railroad Company had been incorporated in 1853 by an act which gave them the right of way over and through the lands of the state to the extent of 150 feet wide on each side of its roadbed, and that said company, in building its roadbed in 1853, had laid it on portions of said sections 29, 30, 32, and lot 2 of section 33; that later the lessor company became the purchaser of all the said property and rights of the said New Orleans, Jackson & Great Northern Railroad Company by mesne conveyances, derived from and under the marshal's sale, etc., set forth in its former plea, and thereafter leased same to the Illinois Central Railroad Company for 400 years; that the only portions of said sections 29, 30, and 32 it was in possession of was said right of way over the same; that, having been in possession of all of said lands under deeds translative of title, it was protected by the prescription of 10 years specially pleaded.

The New Orleans City & Lake Railroad Company answered May 10, 1896, pleading the general issue, and averring that it was owner and possessor in good faith of certain lands on the shore of Lake Pontchartrain, bought by it from its predecessor, the New Orleans City Railroad Company, June 9, 1883, and that its vendor had bought from the New Orleans Canal & Banking Company March 9, 1881; that by itself and authors it had been in noninterrupted possession for upward of 30 years, and in possession in good faith and under title translative of property for 10 years; that it held the property under the banking company, which was bound to warrant the title; and the answer concluded with a call in warranty of the bank, and by pleading all the answers pleaded by it.

The banking company, August 21, 1896, filed its answer to this call in warranty, averring that its sale to the New Orleans City Railroad Company was quitclaim only, without warranty, express or implied, being only a transfer of its rights and claims, such as they were, and prayed that the call be rejected and dismissed. As final judgment was for the railroad company, the call in warranty became immaterial to the case.

The Illinois Central Railroad Company filed its answer June 29, 1896, pleading the general issue and the following special defenses: That it is in possession as lessee of the Chicago, St. Louis & New Orleans Railroad Company of certain squares in lot 2 of section 33, and sections 29, 30, and 32,—the only part in sections 29, 30, and 32 being its right of way, acquired, as stated in its plea of prescription, through the New Orleans, Jackson & Great Northern Railroad Company, to whom the same was granted by section 4 of the act of the Louisiana legislature of 1853; that if said sections were really granted to the state, as alleged by plaintiff, as swamp lands, by the United States, in 1849 and 1850, then the aforesaid grant to the railroad company, and its building its roadbed on said right of way, vested the same in said company, and that said right passed to respondent under its aforesaid lease; that said acquisition from the state, being long prior to the plaintiff's alleged acquisition, defeated

it to the extent of respondent's said right in said sections; that the state, having disposed of said interest in 1853, was estopped from granting the same to plaintiff in 1873; that lot 2 of section 33 composes squares and portions of squares 533, 542, 543, 562, and 563 (old Nos. 500, 501, 490, 491, and 470); that on August 18, 1763, France confiscated the Jesuits' plantation in the then suburbs of New Orleans, and granted and sold part of it to Joseph Petit, who, August 20, 1763, sold to Thomas Saulet; that the Jesuits and Saulet had full possession under patent, survey, and sale; that later France sold and granted to Saulet a back concession to the former tract, of which he had full possession under survey and patent; that said land passed by mesne valid conveyances to the Canal & Banking Company, under and through which company respondent acquired the same by title minutely set forth. The answer concludes with the defense of 1, 3, and 10 years' prescription under the Code.

The Yazoo & Mississippi Valley Railroad Company filed supplemental answer June 29, 1896, averring that all land claimed by plaintiff, as against said company, was acquired by it under deeds from the Canal & Banking Company, Samuel L. Cohn, L. Milaudon, and John Slidell, who acquired it as set forth in the answers of said banking company, which answers respondent adopts and pleads as its own; that since 1882 its right of way has been over a portion of the land claimed by plaintiff, and it therefore pleads specially the prescription of 1 and 2 years under articles 2630 and 3536 of the Revised Civil Code; finally, pleads the prescription of 10 years under articles 3478, 765, and 3544, Id.

George L. Bright, November 2, 1896, filed his demurrer, averring the only land owned by him and claimed by plaintiff consisted of portions of lots 1, 2, 3, and 4 of section 29; that plaintiff's petition showed that he did not claim title to them from the state of Louisiana, but did show he derived title to them by location of a school warrant, subject to approval of the commissioner of the general land office, and failed to allege that said officer approved the same, but did show and aver that he had refused to approve the same, on the ground that said land was not the property of the United States, but that of individuals, who held same under certain French grants.

The Metairie Cemetery Association, November 16, 1896, likewise demurred, averring that the only land claimed by plaintiff, and also by the association, was portions of lots 11 and 12, section 20, and lots 1 and 2, section 29, etc., and further setting forth the same matter as to said lots, and the title thereto under plaintiff's school warrant location, as averred by George L. Bright in his demurrer.

Under these pleadings the case went to trial before a jury November 16, 1896. December 22, 1896, there was judgment, sustaining the demurrers of George L. Bright and the Metairie Cemetery Association, and dismissing the suit as to them. Verdict went for the rest of the defendants, and judgment thereon was signed February 4, 1897. Plaintiff took a writ of error to this court July 13, 1897, on an order of appeal granted the same day, which, being more than six months from the judgment on the demurrer, was held fatal, and the writ of error was dismissed here April 25, 1898. Thus,

these two defendants are eliminated from the case as it now stands. The Howcott Land Company took no writ of error, and hence it, too, is out of the case. The remaining defendants, therefore, are (1) the Canal Bank, as successor of the New Orleans Canal & Banking Company; (2) the New Orleans City & Lake Railroad Company; (3) the Illinois Central Railroad Company; (4) the Louisville, New Orleans & Texas Railroad Company. On December 30, 1896, the New Orleans City & Lake Railroad Company filed a supplemental answer, pleading, in addition to its other defenses, the prescription of 2 years under Rev. Civ. Code, arts. 3536 and 2630, and 10 years under articles 765 and 3544. A mass of documentary proof and oral testimony of many witnesses was adduced on the part of the plaintiff and of all the defendants then before the court, when the court took the case from the jury January 14, 1897, and instructed them to find against plaintiff, and for the Canal Bank, on the ground that it had been proved it had sold, before suit, all the land for which it had been sued, and was not then in possession of any of it, and for the Illinois Central Railroad Company, the Yazoo & Mississippi Valley Railroad Company, and the New Orleans City & Lake Railroad Company, and against the intervener, the Howcott Land Company. Under these instructions the jury brought in their verdict accordingly, and judgment followed, and was signed February 4, 1897. The case is now before this court upon the bill of exceptions and the assignment of errors, which is as follows:

"(1) The court erred in sustaining the exceptions or demurrers of no cause of action, filed herein by defendants George L. Bright, the Metairie Cemetery Association, and the Canal Bank, and other defendants, and in holding that plaintiff did not acquire title under and by virtue of indemnity school warrant No. 3,778, N. S. D., located on lots Nos. 11 and 12, in section 20, and on lots 1, 2, 3, and 4, in section No. 29, township 12 S., range 11 E., S. E. district of Louisiana, east of Mississippi river, containing 196.59 acres.

"(2) The court erred in giving effect to the refusal of the commissioner of the general land office to approve the said location of the said indemnity school warrants, because the land was claimed under alleged grants which were incomplete and had never been recognized by the United States, or any authority thereunder, prior to the acquisition of title by plaintiff; and the court erred in refusing to recognize plaintiff's right and title to said lands under said indemnity school warrant and the location thereof.

"(3) The court erred in sustaining the objections made by defendants to the introduction in evidence on the part of plaintiff of the said indemnity school warrant and location thereof upon the said lands, because the said location had not been approved in consequence of the claim made by defendants that the property was covered by alleged unrecognized French grants; and the court erred in refusing to recognize and allow to be filed in evidence on behalf of plaintiff the said indemnity school warrant, and erred in allowing an alleged and established claim of defendants under alleged, unrecognized, and unestablished French grants to be interposed against plaintiff's rights under said indemnity school warrant and the location thereof upon said lands.

"(4) The court erred in admitting in evidence on behalf of defendants, over and against the objections and exceptions of plaintiff, the burnt and charred portions of alleged leaves of an alleged book of French and Spanish concessions, and in admitting testimony of witnesses relative thereto, and concerning the alleged French grants under which defendants claim title to the lands described in plaintiff's petition; there being no evidence or proof that the alleged French grants ever existed, or that the alleged burnt and charred portions of leaves of the alleged book of French and Spanish concessions were copies from any original, authentic, and lawful grant or concession.

"(5) The court erred in admitting defendants to offer and file in evidence, over and against plaintiff's objections and exceptions, the alleged copy of the alleged French grant of 1757, purporting to contain the certificate of Louis Palms, register of the land office, under date of January 22, 1855.

"(6) The court erred in permitting witnesses produced by defendants to explain and interpret the meaning, purport, and effect of the said burnt and charred portions of leaves of the alleged book of concessions, over and against the objections and exceptions of plaintiff, and in allowing said explanations and interpretations to be given in evidence.

"(7) The court erred in admitting to be offered and filed in evidence by defendants, over and against the objections and exceptions of plaintiff, the document marked 'W,' being an alleged copy of an alleged grant or concession from the government of France by Jean Jacques and Blois de Abadie, and purporting to have been executed under date of the 15th of February, 1764, a date subsequent to the cession of the territory of Louisiana by the government of France to the government of Spain, and at a time while the territory of Louisiana was under the legal dominion of the government of Spain.

"(8) The court erred in admitting to be offered and filed in evidence by defendants, over and against the objections and exceptions of plaintiff, the alleged conveyance from one Louis C. Le Breton, without evidence or proof of any kind of his identity or connection with the alleged Le Breton to whom defendants contended the alleged grants or concessions were made.

"(9) The court erred in giving force and effect to the alleged copies of the said alleged unestablished, incomplete, and unrecognized grants, and in giving force and effect to the testimony which it admitted concerning the same.

"(10) The court erred in refusing to give force and effect to the decision of N. C. McFarland, commissioner of the general land office, dated November 21, 1881, and offered in evidence by plaintiff, and in refusing to recognize the said decision as binding and conclusive against the defendants, and against the validity of the alleged grants set up by them, and as the final termination of the jurisdiction of the land department of the United States, subject to no appeal or review except by the courts in a proper action.

"(11) The court erred in admitting to be offered and filed in evidence by the defendants, over and against the objections and exceptions of the plaintiff, the alleged copy of and the evidence concerning the alleged survey of Don Carlos Trudeau. appearing on its face to be a private survey made in 1791; there being no evidence or proof whatever tending to show that said survey was either authorized or ever recognized by any competent authority.

"(12) The court erred in giving force and effect to the said alleged Trudeau survey and the alleged claim of the defendants based thereon.

"(13) The court erred in refusing to hold that all right, title, and claim in and to the lands described in plaintiff's petition under and by virtue of the said alleged grants, if they ever existed as valid grants, were barred, and the defendants and all persons claiming thereunder are estopped from asserting any claim or title by virtue thereof in and to said lands, because said alleged grants were not reported to the land-office authorities of the United States, or any action taken concerning the same under and in accordance with the requirements of the acts of congress of March 2, 1805, April 21, 1806, and March 3, 1806, and subsequent acts of congress relative thereto.

"(14) The court erred in not giving force and effect to the requirements of the act of congress entitled "An act for ascertaining and adjusting the titles and claims to lands in the territory of Orleans and the district of Louisiana," approved March 2, 1805, the act supplementary thereto, approved April 21, 1806, and the subsequent acts of congress relative thereto, and in allowing evidence of transfers and acts and transactions tending to prove ownership to be introduced in evidence on the part of the defendants by those claiming from and under said alleged grants, to the prejudice of plaintiff's claim and title, and over and against his objections and exceptions.

"(15) The court erred in admitting to be offered and filed on the part of the defendants the alleged last will and testament of Maurice Conway, by act before Brutin, notary public, May 17, 1792, over and against the objections and exceptions of plaintiff, and without proof of the said will ever having been probated or executed, or any action taken thereunder, or of the proof of said will having any reference to the lands claimed in this suit.

"(16) The court erred in permitting defendants to offer and file in evidence, over and against the objections and exceptions of plaintiff, the alleged survey and map, called the 'Grandjean and Pilie Survey and Map,' of ——, 18—, and in giving force and effect thereto, and the evidence allowed to be produced in connection therewith.

"(17) The court erred in not giving force and effect to, and recognizing and receiving as valid, binding, and conclusive, the Sulakowski survey and map, made under the directions of the land-office department of the United States, after full and public notice given to all claimants to lands within the territory surveyed, including the lands described in plaintiff's petition, which survey and map was approved by surveyor general of Louisiana June 22, 1872.

"(18) The court erred in not holding the action of the land department of the United States in making and approving the said Sulakowski's survey and map as a final termination of its powers of survey, hearing, consideration, and action on the claims to lands within the territory so surveyed.

"(19) The court erred in permitting the defendants to offer and file evidence of any surveys or other action by, on the part of, or under the authority of the land-office department of the United States, or any of the officers thereof, and in conflict or at variance with the said Sulakowski survey, or concerning the lands within the territory of said survey, and concerning the lands described in plaintiff's petition, subsequent to the date of said Sulakowski survey, and the action and decision of N. C. McFarland, commissioner of the general land office, under date of November 21, 1881.

"(20) The court erred in taking from the jury the findings of the facts in the case, and in directing the jury to find and render a verdict in favor of the defendants and against plaintiff.

"(21) The court erred in directing that the New Orleans Canal & Banking Company be dismissed from the case, on the ground that it had been proved that the said Canal & Banking Company had sold, prior to the institution of this suit, all the property for which it had been sued, and that it was not in possession of any of the said property at the time of the institution of the suit."

In our view, the issues presented by the pleadings in this case set forth one general question, namely, was the mass of the lands claimed by the plaintiff public lands of the United States at the time of the passage of the swamp-land grants by congress in 1849 and 1850, or were they at that time so affected by foreign grants that the United States could not convey them to the state of Louisiana under their laws? We have not considered, in the examination of this controlling question, the lands claimed by plaintiff as acquired by him directly from the United States under his school-warrant location, otherwise known as the "Cemetery Tract," and "Bright's Riding Tract," and described by him as lots 11 and 12 of section 20, and lots 1, 2, 3, and 4 of section 29, aggregating 196.59 acres, because, as heretofore stated, they have, by the dismissal of the writ of error as to the Metairie Cemetery Association and George L. Bright, been eliminated from the case as it now stands before us. After this elimination, the right of plaintiff as set forth in the petition to the residue of the lands is derived from alleged sales and patents from the state of Louisiana, and her right is alleged to have accrued under the two laws aforesaid. But it is a fair deduction from the defenses of the remaining defendants, as established by the voluminous documentary proof introduced by them, that such residue of the lands sued for are within the established limits of the alleged French grant of October 6, 1757, and of February 15, 1764, to Le Breton; of the French grants or sales of the 18th of August, 1763, to Joseph Petit, and of the 18th of June, 1766, to Thomas Saulet; of portions of the

old Jesuit grant; of the Spanish grant of 1795 to Jean Baptiste Mc-Carthy; and of the congressional confirmation of the 28th of February, 1823, in favor of J. F. E. Livaudais, which also on its face purports to be a confirmation of a French grant. If, therefore, these alleged grants existed under the conditions and in the status contended for by the respective defendants, and had been lawfully surveyed and located by competent authority anterior to the investiture of title in the state of Louisiana as contended for by the plaintiff, or if their descriptive terms and possession under them in good faith, in the absence of such survey and location, operated a severance from the domain, it follows, as a matter of law, that it was not the intention of congress to grant them as a gratuity to a third party. The provisos and exceptions in the swamp-land grants, clearly manifest the purpose of congress not to impair previously existing rights. If, therefore, the court should be of opinion that the defendants fairly made out the existence and validity of such grants, and that they embraced the lands claimed by plaintiff, it would result that his title failed him in its incipiency, without regard to the other and perhaps more difficult questions relating to the title under the grants, possession, good faith, etc. The conclusions we have arrived at on those matters will appear in the consideration of the assignment of errors.

The assignments of error are 21 in number. The first, second, and third assignments need no examination now, as they relate exclusively to the alleged errors committed with reference to that part of the evidence and proceedings affecting plaintiff's right to the cemetery tract and riding park, claimed under and through the alleged school-warrant location.

The fourth, fifth, sixth, and seventh assignments of error may be considered together. They relate to the modes allowed the defendants by the circuit court in establishing the existence, boundaries, and contents of the French grants of 1757 and 1764. It would far exceed the limits of this opinion to do more than review the chief of the modes by which this seems to have been done. We take, first, the grant of October 6, 1757. It was proved by producing in court, from the proper custody, a number of sheets of a record book of ancient appearance, whose edges and corners had been burned, bearing watermarks and stains, containing, in a more or less legible French writing, what purported to be proceedings before the director general of the king of France in the colonies, Jean Jacques Blaise D'Abbadie, including the petition of one Le Breton for a grant of land, and concluding with the formal grant of what had been asked for by the director general, under date of October 6, 1757. This grant was again proved by producing a duly-certified copy, made in 1855 by Louis Palms, then register of the United States land office in New Orleans, taken from a "Register of French and Spanish Concessions" in his office, from pages 54, 55, 56, and 57, inclusive. It was also proved a third time by producing in court the original copy in French, made in 1795, by Armesto, then secretary of the Spanish colonial governor, as taken from the "Book of Concessions" of lands in his charge. The mode of proof of the grant of 1764 was similar.

The defendants produced a copy, duly certified by Louis Palms, register as aforesaid, made by him in 1854, and certified by him as taken from "Book A, No. 1, of French and Spanish Concessions, page 137 of the record" in his office. This grant of 1764 was further proved by producing in court the burned fragments of the record book, etc., as more particularly described in reference to the grant of 1757.

It is thus shown that the mode of proof by the burned fragments of the record book taken from the land office included both grants,— that of 1757 and 1764; that each was likewise proved by the copies certified by Mr. Palms as register; and that the grant of 1757 was further proved, as we have shown, by a copy certified in 1795 by the secretary of the Spanish governor. As the basis for the proof thus afforded, the court ascertained historically that there was, as a part of the Spanish archives of the province of Louisiana, a book, or series of books, called "Registers of Grants," in which memorials and other documents relating to the granting of lands by the Spanish and French authorities had been recorded prior to the delivery of the province, in 1803, to the United States. A reference to White's Recopilacion (volume 2, pp. 482–484) shows that such a book or books were so kept, and formed the subject of a correspondence between the Spanish governor, De Lomos, in 1799, and the Spanish intendant, J. V. Morales, when the faculty of granting lands in the province was taken from the governor and restored to the intendant. In the case of Millaudon v. McDonough, 18 La. 108, we find a reference to a book of record of French grants, then kept in the land office at New Orleans, and in that case a certified copy of a French grant, made in 1769, was introduced in evidence from the book in question. In the case of Lavergne's Heirs v. Elkins' Heirs, 17 La. 227, the language of the supreme court of Louisiana makes direct reference to such a book, saying:

"We have produced before us the original record of complete grants made by the Spanish government, in charge of the proper officer of the United States who is by law the keeper of that description of the archives, obtained from the former sovereign of the country, in which we find a page bearing evident marks of antiquity, and on it, registered in form, a grant to a person bearing the name of the ancestor of the plaintiff; * * * and not the least suspicion of fraud attached to it."

It was further said in that case:

"There has been produced to us a book purporting to be a register of complete grants of land made by the French and Spanish governments in Louisiana, which book is in the keeping of the register of the land office in the city of New Orleans, and is proved to be a part of the archives thereof. As to its authenticity, we have the external evidence which the book itself contains. History and tradition inform us that such a record was kept, and, although it may not contain a complete register of all the grants made by the French and Spanish governments in the province of Louisiana, we are not aware that the genuineness of any recorded in it has been questioned."

Charles H. Dickinson, then United States surveyor general of Louisiana at New Orleans, produced in court an inventory purporting to have been made and certified, May 15, 1861, by Louis Palms, register, of the property then in his office as register, in New Orleans; the first three entries in such inventory showing eight books or reg-

isters of French and Spanish grants as then forming part of the archives of said office. It was then shown by the testimony of several witnesses, without contradiction, that there was a fire in the land office at New Orleans, early in the year 1865, by which the greater part of the records were destroyed; what was left being more or less charred by the fire and damaged by water. One of the witnesses testified that he was a clerk in the office at the time of its destruction, and aided in rescuing a portion of the records, and among them the charred remnants of one of the books or registers, and that he washed and cleaned them; and he identified at the trial the burned sheets containing the record of the grants of 1757 and 1764 as among the papers thus rescued by him. Another witness testified that afterwards, when the land office was reorganized and reopened in the custom house, he saw there, and examined, the burned fragments of the book in question. This testimony, uncontradicted, as it is, entirely satisfies us that there was such a book of record of French and Spanish concessions, kept by the government of Spain, and transferred by that government, with the colonial archives, to the authorities of the United States; that such book went into the custody of the United States land office at New Orleans; that it was partially burned; and that the fragments were properly admitted in evidence as proof of the existence of the grants contained in the leaves referred to.

The fourth assignment of error concludes with the charge that the proof thus made, by the introduction in evidence of the charred portions of the alleged book of French and Spanish concessions, was erroneous, because not preceded by proof that the grant ever existed, or that the leaves of the alleged book were copies from any original, authentic grant. The obvious answer to this is that the proof of the existence of the grants was necessarily involved, and was a part of the evidence as offered, and that the alleged want of authenticity and legality in the grants could only be removed by the grants themselves.

As further grounds for the introduction in evidence of the various copies of the grants of 1757 and 1764, as taken from the archives of the United States land office at New Orleans, it was shown in the arguments before the court that section 4 of the act of March 2, 1805, creating boards of land commissioners in the Eastern and Western districts of the territory of Orleans, made it the duty of such boards of commissioners "to demand and obtain from the proper officer and officers all public records in which grants of lands, warrants or orders of survey, or any other written evidence of claims to land derived from either the French or Spanish governments, may have been recorded." Section 5 of this act requires each board, on its dissolution, to deliver its records to the register of the land office. Such register in each district formed, with the two commissioners proper, the board of land commissioners for such district. The land office proper, as now organized in New Orleans, was created by the third section of the act of March 3, 1811, and it was provided that a receiver should be appointed, who, with the register appointed under the aforesaid act of 1805, should constitute the register and receiver

of the land office proper, charged with the sale and administration of the public land. From these statutes we gather that the archives referred to in the act of 1805 were, on the dissolution of the board of commissioners created by that act, delivered to the register under it, and, remaining in his custody, constituted a part of the records of the land office, composed of the register and receiver, as provided for under the act of 1811. This land office continues to this day, with its records in the city of New Orleans, and it was the register of that office, Louis Palms, in 1861, who furnished the inventory of the property in his custody, referred to by us, and which inventory was produced from among the records of the United States surveyor general's office, where it had escaped the fire of 1865, referred to.

From this it would seem that there was ample proof, historical and otherwise, adduced in the circuit court, as the foundation for the secondary proof we have heretofore referred to at large, and under which the defendants established the grants in question. But the proofs contain in themselves much intrinsic evidence of their authenticity. Making due allowance for the errors of translators and copyists, there is a remarkable correspondence between the three sources from which the proof of the grant of 1757 is made. Armesto's copy is certified by him as "taken from the book of concessions of lands that, as secretary of the governor, I have under my charge, from the reverse of folio 54, to the front of folio 57." Palms' copy of the same grant is thus certified: "A true copy of the original record in this office, in the Register of French and Spanish Concessions, in Book No. 1, at pages 54, 55, 56, and 57, inclusive." It is also observable that Register Palms' copy of the grant of 1764 states that it is "taken from Book A, No. 1, of French and Spanish Concessions, page 137, of record in this office." This correspondence, in the paging from which Armesto and Palms took their copies of the grant of 1757, is very suggestive, when we consider that each appears to have had the original book in his lawful custody, that one made his certificate in the year 1795, and the other in the year 1855. It is observed that Register Palms certifies his copy of the grant of 1764 as taken from page 137 of the record, and as we know that the grant and antecedent proceedings of 1757 occupied a good many pages of any ordinary record book, and as we have a right to infer that there were intervening grants made between 1757 and 1764, the imputing of several pages of the record to one and a single page to the other forbids the idea of contrivance or design in these copies. Further: The space between page 57, where the record of the grant of 1757 ceased, and page 137, where that of the other grant began, may fairly be considered as the space which the intervening grants probably occupied in the record.

The proof of the genuineness of the Armesto copy, it seems to the court, was full and satisfactory, and it is difficult to perceive how it could have been better. History informs us that Andres Lopez Armesto was what he certified himself to be in 1795,—the secretary of the Spanish government of the Louisiana colony. The signature to his copy, we think, should be noticed judicially, and it would at least devolve upon the party denying its genuineness the burden of prov-

ing it a forgery. Hayes v. Berwick, 2 Mart. (La.) 139; Davis v. Police Jury, 19 La. 532; Choppin v. Michel, 11 Rob. (La.) 233. But the defendants went a step further, and, considering the great age of the certificate in question, produced the most satisfactory and affirmative proof of its genuineness. They brought into court notarial records of Andrew Hero, among which were a number of original acts purporting to have been executed as authentic acts by the same Armesto, before Brutin, notary public in New Orleans, in 1791, 1793, and 1794; and several witnesses, who testified as experts, proved that the signatures to all these acts were one and the same signature, and signed by the same person who certified the copy of the grant of 1757. This, considering the ancient character of the acts in question, and their public character, was satisfactory proof establishing the genuineness of Armesto's signature to the copy. Voorhies' Rev. Civ. Code, La. arts. 2234, 2236; McDonough v. Fost, 1 Rob. (La.) 295; Whart. Ev. § 711; Greenl. Ev. §§ 21, 570–576; Bradner, Ev. 399, 400.

The seventh error assigned requires special notice. It amounts to an allegation that the grant of 1764 was not properly admissible in evidence because the grantor sovereign, France, had previously transferred "the legal dominion of the government to Spain." We do not understand, if the proof of the grant was otherwise competent, how this objection could do more than go to its effect. But, aside from this, we are of opinion the objection was not well taken, because its allowance by the circuit court would have cut the defendants off from showing, if they could, that Spain subsequently affirmed or recognized the grant, if originally invalid, or that France herself, when she again acquired the province from Spain in 1800, and took actual possession in 1803, had recognized or ratified it. We find that, in another stage of the trial, the clearest proof was administered showing that, in 1791, if not at other times, Spain fully recognized the grant. Allusion is here made to the survey by the Spanish surveyor general, Trudeau, which will be considered hereafter.

In the suit for judicial confirmation of a French grant in Louisiana, dating after the cession to Spain of 1762, and which came before the supreme court in U. S. v. Pillerin, 13 How. 9, the objection taken by the United States was the same as that now taken by plaintiff against the grant of 1764,—that the power to grant had previously passed from France by the treaties of 1762 and 1763. In the proof and argument it was sought to be shown that such objection was cured by subsequent acts of recognition and ratification on the part of Spain, and possession and acts of ownership on the part of the grantor and his heirs. Chief Justice Taney, speaking for the court, said:

"But if there has been such a continued possession and acts of ownership over the land as would lay the foundation for presuming a confirmation by Spain of this grant, or either of them, or any portion of them, such confirmation would amount to an absolute title, which, if afterwards recognized by the Spanish authorities, is protected by the treaty, and is independent of any legislation by congress, and requires no proceedings in the United States to give it validity."

This defeated the jurisdiction of the United States district court, and ended the case, because, under the act of the 17th of June, 1844, under which the suit was brought, imperfect grants which needed confirmation alone could be put in suit, while complete ones, which stood protected by the treaty, were not provided for by the act.

As the circuit court and secretary of the interior understood, and as we understand, the grants of 1757 and 1764, it does not materially affect the case of defendants, or at least those of them deriving title under the grant of 1757, whether the grant of 1764 was subsequently validated, or not, by Spain or France, because it is evident, from the translations found in the record (and, if not so, is clearly shown by a mass of competent proof), that the latter grant was in itself only a regrant or confirmation of the prior and larger grant of 1757. These translations, or the best of them, we find on pages 271 and 257 of the printed transcript. The latter grant begins:

"In consideration of the present request, and the certificate of M. Ancelot, engineer of this colony, and by virtue of the authority vested in us by his majesty, we do, by these presents, if not already done, concede to M. Le Breton the land prayed for, to begin from the rear limit of the land occupied by him at the place formerly called the 'Village of the Collipissas Indians,' near the Bayou St. John, bounded on one side by the plantation of M. Desauisseaux, and on the other side going towards the Tchoupitoulas, adjoining that of M. Chabert, and extending in depth to Lake Pontchartrain, running north and south on its side lines," etc.

The request of Le Breton, on which the patent professes to proceed, has not been produced, nor the certificate of the engineer, M. Ancelot. As we find that the grantee sold and conveyed the land thus regranted or confirmed to him on the 12th of November, 1764, it is a fair inference that he solicited the confirmation to satisfy some objections raised by his intended vendee, Maxent, or for some reason not suspicious and now apparent. These views, in addition to what will be said in treating the eleventh assignment, relating to the Trudeau survey of 1791, are sufficient to dispose of the fourth, fifth, sixth, and seventh assignments of error. We think none of them are well taken.

The eighth in the series finds error in the admission of the conveyance from Le Breton to Maxent of the 12th of November, 1764, without proof that the vendor was the same Le Breton to whom the grants were made. Under the view we have taken of the material issues in this case, we fail to see how the admission of this deed could prejudice the plaintiff, even if we should assume as a fact that the Le Breton of the grant was not the Le Breton of the notarial act. Plaintiff, having brought ejectment for the land alleged to be in the possession of the defendants, could recover only by establishing title in himself, not by showing the want of it in the defendants. McMaster v. Stewart, 11 La. Ann. 546. Such is the fundamental rule in the state and federal courts in Louisiana, if not in all the common-law states. Code Prac. La. art. 44; Buras v. O'Brien, 42 La. Ann. 527, 7 South. 632; Thompson v. Meyers, 34 La. Ann. 617. Tested by this controlling principle, if the defendant succeeded in proving the existence, validity, and location of the grants

of 1757 and 1764, or the former of them, the source of title as set up by plaintiff under the grant in 1849 and 1850 by the United States to Louisiana would fail, whether Le Breton conveyed the land to Maxent or not; that is, his title would fail to the extent it was shown to be in conflict with the prior grant. The assignment seems to overlook this principle and to proceed on the theory that, if the deed to Maxent should fail, as so remote a link in the chain of title connecting the Canal Bank and the New Orleans City & Lake Railroad Company with the grant of 1764, such hiatus would in some way operate to prejudice the foreign grants. We think this an error, and in that view repeat that the admission of the deed did not prejudice the plaintiff.

But the intrinsic proof of the identity of the two persons, furnished by the two grants and the deed, is very strong; at least, sufficiently so to have devolved upon the party who denied it the burden of showing differently. In the first place, it is to be observed that Le Breton was a planter of considerable landed property, fronting on the river and extending northward to the lake, being described in the grant of 1757 as "the counselor, assessor of the superior council of the province." In the next, it is undeniable and undenied that the Le Breton of the grant of 1757 was the Le Breton of 1764. In the next, the sale made shortly after, before the royal notary, Garic, refers to the vendor as "counselor at the court of Paris," and one of the parties to the sale was La Freniere, the attorney general of the king, acting as undertutor for one of the minors Le Breton. The petition on which the grant of 1757 was made had set forth that Le Breton had married Marguerite De La Freniere, daughter of a La Freniere deceased. The sale, further, appears to have been made under a decree of the council, by virtue of a family meeting duly homologated. It is well known and well established that the royal notaries in New Orleans, at that time, required the vendor of lands to produce his title before passing formal and authentic conveyances. The sale, too, was for a large sum for those times, $10,000, if we may trust the translations, and possession went with it. The assignment assumes that, notwithstanding all these circumstances and environments, the vendor in the deed of the 12th of November, 1764, was not the grantee in the grant made only nine months before. This involves, if we properly understand the objections, a successful imposition, practiced, not only on the vendee, Maxent, but also on the notary, the king's attorney general, the deputy attorney general, and the witnesses. All are said to be of the same residence, the town of New Orleans, then a small place, in which persons of any consequence must have been personally known to each other. In every view we can take of it, this assignment must be considered as not well taken.

The ninth assignment seems to present nothing we can pass upon. The error complained of is to the force and effect given by the circuit court to the grants, and to the testimony affecting them, after such grants and testimony had been admitted in evidence.

The tenth assignment has no force in it. It alleges error in the court's refusing to give controlling effect to the decision made by

the commissioner of the general land office on November 21, 1881, as conclusive against defendants and the grants set up by them, as a final determination by the land department of the United States, subject to no appeal or review except by the judicial tribunals. This doctrine overlooked the fact that the decision was only one of a series of decisions and rulings in the executive tribunals, beginning in 1875 and ending in 1887, progressing by regular appeals from that one, presided over by the register and receiver, in New Orleans, to the higher one in Washington, presided over by the commissioner of the general land office, and by appeal from him to the ultimate appellate one, at the head of which we find the secretary of the interior, the immediate representative of the president. These tribunals, both as to jurisdiction and practice, are created and regulated by statutes and rules of procedure, the fruit of long usage and custom. Rev. St. U. S. tit. 11, cc. 2, 3. The error alleged is, in effect, that these statutes and rules, and the established practice under them, gave to this intermediary decision of the head of the general land office a status of exclusiveness and finality which the circuit court denied. But the objection overlooks the fact that the very court rendering the decision allowed an appeal to the secretary of the interior, and that an appeal was taken in due time, and resulted in the controlling decision of the head of the department, of January 18, 1884, which overruled in toto the former one. Thus these tribunals, which, we presume, understood the law and practice applicable to the question, virtually condemn the position now taken by the plaintiff. We might add that a careful examination shows the decision was not intended to be final, because of its concluding sentence, and from the further reason that the record as then made up did not seem to justify a final adjudication. We think, therefore, that there was no error in the refusal of the court to give the ruling the effect contended for, and that the assignment was not well taken.

The eleventh and twelfth assignments may be considered together, the twelfth necessarily failing if the eleventh was bad. It presents the question whether the court erred in admitting the procès verbal of the survey by Trudeau, in 1791, of the lands as granted in 1764, and the evidence of the experts, explanatory of it, without proof that it was authorized or recognized by competent authority; it appearing on its face to be only a private survey. If we can trust the translation of this procès verbal of field operations as found in the record, we think it contains within itself proof that, if not begun by public authority, it was continued and finished by the express authority of the civil and military governor. It professes to be an operation carried on along the high and open land fronting the Bayou Metairie, for the purpose of fixing the front and side lines, on that stream or ridge, of the 20, the 5, the 2, and the 2 arpents, respectively sold by Almonaster to Pedro Langliche, Pedro de Mouy, Inez, and Mathew de Veau. Almonaster had bought the Vacherie tract proper, or the grant of 1764, from the Order of the Capuchin Monks, who had bought from Maxent, who, as we have seen, bought from Le Breton in 1764. The sales from Almonaster, in point of date, seem to have begun on the west side of the tract, proceeding

towards the east, the last sale being to Maurice Conway of what was left, estimated in the sale to be from 16 to 21 arpents. After giving to each of the prior vendees his fixed front on the ridge, the surveyor reached the plantation of Conway, and found the residuum to be only 10 arpents and a little over, instead of the 16 to 21 which Conway had bought. This led Conway to oppose further proceedings, and thereupon, on that day, the 21st of February, the work having begun on the 16th, the procès verbal informs us the whole matter was referred to the governor. "I refuse to continue the proceedings until his excellency shall determine them." It further informs us that on the 16th of March a decree or decrees were rendered, under which the survey was completed, and the rival claims of the vendees of Almonaster adjusted. The survey purports to be made by Carlos Trudeau, Esq., "royal and private surveyor of the province of Louisiana," but he signs himself, simply, "Carlos Trudeau, Surveyor"; and, but for the circumstance of the action of the government we have referred to, it would appear obnoxious to the objection made by the plaintiff that it was but a private survey. But it is evident that the survey has been respected and enforced in various ways by the surveying and land authorities of the United States, and was closely adhered to by the officers of the interior department in surveying and establishing the grants of 1757 and 1764, under the decisions of the secretary of the interior of 1884 and 1887, which we will refer to hereafter.

It would far exceed the proper limit of this opinion to advert to all the mass of authorities, direct and indirect, contained in the record and in the reports of land commissioners and acts of congress confirming them, recognizing and enforcing this Trudeau survey. One or two references must suffice. An examination of the Sulakowski survey of 1872, under which the rights of plaintiff are alleged to have arisen, will show that he gives the fronts on the Metairie ridge of the claims of Francois Doville, Angelique Ory, Joseph Beaulin, Narcisse Lasse, Marie Pierre Dumovir, Jean Louis Beaulin, and Hazeur Bros. an aggregate width of about 83 chains, while in Trudeau's survey the same fronts of the same claims were given an aggregate distance of 27 arpents, which in American measure is equal to about 79 chains; while the difference between the fronts of the claims of Danville Ory and Marie Joseph Beaulien, as given, respectively, by Sulakowski and Trudeau, amounts to the insignificant distance of $^{54}/_{100}$ of an arpent, or about 100 feet. The aforementioned vendees of Almonaster, and others to whom they transferred their rights, or portions of them, obtained confirmations for their respective portions by presenting their pretensions to the boards of land commissioners, and we find in these reports references to this Trudeau survey. In the report of the board, dated September 5, 1833, on the claim of Francois Danville, which we find on page 676, vol. 6, of American State Papers, we see it stated:

"The said tract of land originally formed part of the tract surveyed in the year 1791 by Don Carlos Trudeau, in favor of Pierre Langliche."

And, on the same page, the board, in passing on the claim of Angelique Ory, No. 26, says:

"The said tract of land is part of a larger tract of 20 arpents, formerly owned by Don Almonaster y Roxas, who conveyed the same to the late Pierre Langliche, a free colored man, on the 1st day of October, 1787, in favor of which latter it was regularly surveyed by Don Carlos Trudeau, surveyor general of the late province of Louisiana, on the 19th day of March, 1791."

In passing on the claim of Jean Louis Beaulien (same page of the State Papers), the board says:

"The said tract of land originally formed the upper moiety of the tract formerly owned by Don Mateo Devo y Inez, in whose favor it was regularly surveyed in the year 1791 by Don Carlos Trudeau, surveyor general of the late province of Louisiana."

All of these claims were confirmed, on the reports of this board, by the acts of congress of March 3, 1835, and July 4, 1836. They were all sustained before the board on the surveys made by Trudeau, either in 1791 or later, as the reports show; and subsequent surveys by Sulakowski of these derivative claims, and later by Grandjean and Pilie, as portions of the grants of 1757 and 1764, the title to each portion tracing back to the sale from Almonaster and others, leave no doubt in our minds that the parent survey by Trudeau, now under consideration, has been in the amplest manner, as stated above, recognized and enforced by the competent authorities of the United States. We think, on the whole, that the survey was properly admitted; and, this being so, it was entirely competent for the court, if not absolutely necessary to its intelligent understanding, that it should be explained, with reference to the adjacent surveys and locations, by the experts, Pilie and others, who were examined as witnesses for that purpose. The survey seems to have been produced from a custody not suspicious, but one from which we would naturally expect such a document to be produced, viz. the United States land office in New Orleans, the successor of the board of commissioners who passed upon the claims which we have referred to as confirmed by the acts of 1835 and 1836. Those reports, referring, as we have seen, in several of the claims, to this survey, it is reasonable to suppose that one or more of the claimants filed it in support of their contention, thus making it a public document, belonging to the records of the office, whence it was produced at the trial by the register of that office, Dr. Brumby, in response to a subpoena duces tecum, requiring him to produce it. Upon the whole, we are well satisfied, considering the ancient character of this instrument, and the difficulty of adducing primary proof of such ancient transactions, that the procès verbal was properly admitted in evidence, with the evidence of the experts explanatory thereof.

We therefore pass to the thirteenth assignment. This thirteenth assignment finds error in the circuit court's refusing to treat the foreign grants pleaded by the defendants, and their rights under the same, as void, on the ground that the grants themselves had never been presented to the authorities of the United States for confirmation, and had never been confirmed in pursuance to the acts of congress of March 2, 1805, of April 21, 1806, of March 3, 1806, and later acts. This objection is broad enough to cover all the foreign grants we have referred to, pleaded by the various defendants, and is so general in its terms that it is difficult to apply it or to consider it intelli-

gently.    To illustrate our meaning, we refer to the grant to McCarthy of 1795, and the grant to Livaudais,—or, at least, to the grant under which he claimed,—both of which, we have seen, were confirmed by congress.    As the exception and assignment do not distinguish between the grants which have thus received the confirmation of congress and those which have not, we feel warranted in disregarding it. However this may be, it is very clear that it is drawn in disregard of the pleadings and the proofs in the record, which show that all the other grants to which the assignment can possibly refer appear to be complete, perfected grants, emanating from the foreign governments from which the United States acquired the province of Louisiana, and which, under the treaty of cession, were respected as private property without the necessity of congressional or other confirmation on the part of the United States.    This doctrine of the binding force and effect of perfect grants is so well established that few authorities are needed in support of it.    See Lavergne's Heirs v. Elkins' Heirs, 17 La. 227; Riddle v. Ratliff, 8 La. Ann. 106; Murdock v. Gurley, 5 Rob. (La.) 457; U. S. v. Percheman, 7 Pet. 51; U. S. v. Wiggins, 14 Pet. 334; Fremont v. U. S., 17 How. 542; Maguire v. Tyler, 8 Wall. 650; 4 Op. Attys. Gen. 643–713.    We do not find that the special acts of congress, referred to by the assignment, countenance the doctrine contended for.    While they required confirmation by congress of incomplete and inchoate titles emanating under the former sovereigns of the province, as a condition precedent to their recognition by the executive officers of the government, and their enforcement in the federal courts when brought in question, they utterly fail to exhibit any intention on the part of congress to subject to this requirement, under the penalty of forfeiture, completed titles like those in question.    Such required no action at the hands of the new sovereign to give them validity and standum in judicio in the federal tribunals.    All that the government of the United States could have done, and all we believe they have ever claimed the right to do, with respect to such grants, was to survey them or resurvey them, under the United States system, to give them designations and connections with other surveys, in order that they might be protected and distinguished from other claims, and from the public lands adjacent to them.    It is apparent that, if the grants in question were any grants at all, they were completed and perfected under the governments creating them, and no principle of justice or of expediency required that the parties holding under them should proceed, as the plaintiff suggests, under any laws of congress, with a view to confirmations of rights which were already sacred under the treaty of 1803. We, therefore, are all agreed that this assignment is not well taken.

The fourteenth assignment seems to be the same matter in a somewhat different dress, and means the same thing; and we therefore answer it in the same way.    We might say, in conclusion, on this subject, that sections 4 and 5 of the act of March 2, 1805, and sections 2 and 3 of the act of April 21, 1806 (two of the laws referred to in the assignment), so far from manifesting any intention to require claimants under complete grants to have their claims confirmed by congress, bear a contrary construction.    We fail to find any law dated

March 3, 1806, referred to in the assignment, on the subject of private land claims.

This brings us to the fifteenth assignment of error, which alleges error on the part of the circuit court in admitting in evidence the copy of the last will and testament of Maurice Conway, executed May 17, 1792, before Brutin, notary, without proof that the will had been probated or action taken under it, or proof that the will has reference to the lands claimed in the suit. We see no force in this objection. If it was wrong to admit the evidence, as we have heretofore shown with reference to the eighth assignment, we do not perceive how it could prejudice the case of the plaintiff. The will and proceedings under it could in no way aid or impair the grants opposed to the plaintiff, and which, if valid and proved to embrace the lands claimed by him, would have the effect of defeating the title of the United States in and to the same, and prevent their conveyance to the state of Louisiana under the swamp-land grants through which the plaintiff claims. But, if it were otherwise, we think, considering the ancient character of the will, and the long line of possession of the property in question under it, it was properly admitted in evidence. It has stood as a muniment of title to lands of great value for at least 100 years; and the deeds adduced in evidence by the defendants, tracing title back to this will, uniformly show extensive improvements on the land, together with acts of possession and ownership, all of which are consistent with the presumption that the will was duly established, and inconsistent with any other presumption.

We pass to the sixteenth assignment. The error here assigned, as we understand the objection, is to the admission on the part of defendants of the survey and maps of the grants of 1757 and 1764, made by Grandjean and Pilie, under the definitive decisions of the land department recognizing those grants and requiring their survey and location. This assignment may properly be considered in connection with the seventeenth, eighteenth, and nineteenth, all of which relate to the same subject-matter, and call in question the validity of the government's action, through its land department, in canceling and annulling thereby the survey of Sulakowski, and establishing in its stead the survey known as that of Pilie and Grandjean. Under these assignments, then, the whole proceedings of the interior department, beginning, as we understand it, with the petition of the Canal Bank, in 1875, for the recognition of the grants under which it held, and ending with the final cancellations, in 1887, of the swamp-land selections in favor of the state of Louisiana, are brought up for review. At the outset it is well to observe that it is not claimed by the defendants—at least, not by the principal defendant, the Canal Bank—that these proceedings have any controlling effect in the federal judicial tribunals, except in so far as they have fixed positions, quantities, and relations to other grants and the public lands, of the grants which have been surveyed under them. As it is expressed in one of the briefs for the bank:

"The proceedings, we contend, are conclusive, and beyond review here, so far as they have fixed the boundaries, connections, and contents of the foreign grants in question, but are subject to such review, so far as they recognize

the existence and validity of said grants, and the rights of defendants under them. In other words, we think the survey of the grants by the appropriate federal executive authority concludes the court, in the absence of fraud or mistake of fact, from going further, and that the action of the executive authority in canceling the entry, selection, and location thereof, and maintaining the rights of the Canal Bank and its vendees under the alleged foreign grants, should control the court only so far as reason and authority will sustain them."

Under the authorities, and from reason and necessity, we think this is a correct view of the law, and, except under particular laws, such as the act of March 3, 1851, relating to California, and the act of the 26th of May, 1824, relating to Missouri and Arkansas, and a few others, the judiciary have never attempted to control, or been thought competent to control, the survey and location of foreign grants of land; and even under these exceptional statutes the surveying department of the government seems to have proceeded, in the survey and location of grants previously confirmed by the courts of commissioners under the acts, with the same discretionary and exclusive authority as to fixing the boundaries, quantities, etc., as they would have done in the case of grants confirmed by acts of congress or by treaty. In the cases of Magwire v. Tyler, 1 Black, 195, and Cragin v. Powell, 128 U. S. 699, 9 Sup. Ct. 203, these principles were recognized and enforced. But in the later case of Knight v. Association, 142 U. S. 161, 12 Sup. Ct. 258, the point came up. The question, or one of the controlling questions, was as to which of two surveys of a private claim to land, having a foreign origin and confirmed under the above California act of 1851, should prevail,— the first one having been approved by the surveyor general of California and by the commissioner of the general land office, and no appeal taken to the head of the department to cancel or reform it; the second and last having been made under the express direction of the secretary of the interior, under his general supervisory authority as the head of the department. The facts of the case bear close relation to the case at bar, so far as the conflicting surveys of Sulakowski and of Grandjean and Pilie are concerned. But the opinion of the supreme court in the strongest language vindicated the authority of the secretary to annul the survey deemed by him erroneous, and to prescribe the mode in which another should be made to supersede it. The report of the case (pages 177–181, 142 U. S., and pages 262–264, 12 Sup. Ct.) reviews at much length all the different authorities, and it is sufficient to say that, in our view, they leave not a doubt that the authority of the secretary to annul the Sulakowski survey, and make another in its stead, was ample. In a still later case, involving the federal survey of a French grant in Louisiana, made April 3, 1769, the supreme court refused to control, by injunction, the secretary in changing the survey approved by the commissioner of the general land office, and, by a new survey, throwing out part of the land, as public domain, included in the first one. See New Orleans v. Paine, 147 U. S. 264, 13 Sup. Ct. 303. It was stated by the supreme court in the California case, speaking of the rival surveys therein involved:

"We conclude, on this branch of the case, that the secretary of the interior had ample power to set aside the Stratton survey, and order a new survey by

Von Leight, and that his action in such matter is unassailable in the courts in a collateral proceeding. The Von Leight survey, therefore, must be held as a correct survey of the pueblo claim, as confirmed by the circuit court."

The instructions and contract, introduced into this record by the industry of counsel, under which Sulakowski made his survey, ignoring the various grants, or portions of them, and returning them as vacant public lands, together with the information, direct or indirect, about those grants, which we know from the record was within his reach, if not in his official custody as a government officer, demonstrated beyond controversy that the survey was grossly erroneous, if nothing worse, and that it should have been canceled quoad its interference with private property. Granted that there did exist the foreign grants in question, and that proof was accessible of their boundaries, locations, etc., it would have been a strange condition of law that would have denied the power in some department of the government to correct the mistake. The correction, or, in other words, the proceedings complained of in the assignment now under review, were not ex parte, and without full trial or argument, as we gather was the case in the action of the secretary sustained by the court in the California case we have cited; but, as we learn from the record, they have been fairly and regularly carried on contradictorily with the state and her vendee, Dr. Smyth, the plaintiff, from first to last. Every step seems to have been stubbornly contested upon one side or the other by astute and able counsel, and we are struck by the ability and thoroughness revealed in the various decisions of the executive officers, as well as the research and talent characterizing the briefs of the attorneys who conducted the battle. In this connection we observe from the record (printed transcript, page 391) that, in trying the case as made by the petition of the bank in 1875, the register and receiver had, in 1885, before them, sent from the department in Washington, 79 documents or different items of proof which had been before the secretary when he made his decree of January 18, 1884. If fraud or ill practice or imposition on the officers of the government had been shown against the good faith and regularity of the proceedings complained of by the plaintiff, the case might be different. Such proof would at least have caused a suspicion against what otherwise seems to have been fair and regular. In the absence of such proof, and even allegations of that nature, the court deems itself powerless to question the surveys by the government of the grants in question. As to the validity of such grants themselves, and their binding effect under the treaty, those are different questions, and are certainly in this proceeding open to review, and the findings of the executive authorities, as shown by the record, on these subjects, can have no other effect here than such as their reason will justify.

Before leaving these assignments (16, 17, 18, and 19), it may be proper to state the view we take of the law involved in the annulment of the state patents under which the plaintiff holds part of the land claimed by him, which must result if the judgment of the circuit court be affirmed. We take it to be well settled that, in an action in ejectment in the federal courts, which is an action at law,

where the plaintiff sets up a patent or any other grant from a state, it is competent for the defendants to defeat the patent or grant by showing, by competent proof, entire want of title in the grantor thereof. In this case the defendant is not required to go to equity to obtain relief, but may meet the case of the plaintiff by showing that the thing granted was not in the grantor, or that the officer pretending to grant had no authority in law to make it, or that the land granted was reserved from sale or any other mode of disposition. The leading, and perhaps earliest, decision on this point is that of the supreme court in Polk's Lessee v. Wendell, 5 Wheat. 293. It was said:

"But there are causes in which a grant is absolutely void, as where the state has no title to the thing granted, or where the officer had no authority to issue the grant. In such cases the validity of the grant is necessarily examinable at law."

A later and more pointed decision, perhaps, is that of the supreme court in the leading California case of Wright v. Roseberry, 121 U. S. 519, 7 Sup. Ct. 985. In that case the court annulled and set aside patents of the United States, issued in 1866, 1867, 1868, and 1871, for public lands purchased under the pre-emption laws of the United States, on the ground that, by the swamp-land grant of the 28th September, 1850, the lands had passed to the state of California, beyond the jurisdiction of the officers of the United States, and had ceased, by the mere operation of the swamp-land grant itself, to be United States land, subject to their laws and control. The general law on the subject was thus laid down:

"The doctrine that all presumptions are to be indulged in support of proceedings upon which a patent is issued, and which is not open to collateral attack in an action of ejectment, has no application where it is shown that the land in controversy had, before the initiation of the proceedings upon which the patent was issued, passed from the United States. The previous transfer is a fact, which may be established in an action at law as well as in a suit in equity. When we speak of the conclusive presumptions attending a patent for land, we assume that it was issued in a case where the department had jurisdiction to act, and executed it; that is to say, in a case where the lands belonged to the United States and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if congress had made no provision for their sale, or had reserved same, the department would have no jurisdiction to transfer them; and it is an admitted consequence that they would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed. The action of the department would, in that event, be like that of any other special tribunal, not having jurisdiction of a case which it had assumed to decide. Matters of this kind, disclosing a want of jurisdiction, may be considered by a court of law. In such cases the objection to the patent reaches beyond the action of the special tribunal, and goes to the existence of a subject upon which it is incompetent to act."

And it was added:

"A patent may be collaterally impeached in any action, and its operation as a conveyance defeated, by showing that the department had no jurisdiction to dispose of the lands; that is, that the law did not provide for selling them, or that they had been reserved from sale, or dedicated to special purposes, or had been previously transferred to others. In establishing any of these particulars, the judgment of the department upon matters properly before it is not assailed, nor is the regularity of its proceedings called into question; but its authority to act at all is denied, and shown never to have existed."

The court then cites Polk's Lessee v. Wendell and many other analogous cases not necessary now to be reviewed by us. This case of Wright v. Roseberry determined the fact that the swamp-land grant of 1850 was a grant in præsenti, and that it acted upon lands as then affected by law, and that the subsequent change in the legal status of any land would not bring it within the grant. If this is so, as to the swamp-land grant of 1850, it must needs be so as to that of 1849. These authorities amply sustain the jurisdiction of the circuit court in the instant case to disregard and annul the state patents under which plaintiff claims; and, if such power extends to the patents themselves, it needs no argument to show that it likewise extends to the certificates or receipts under which plaintiff holds, and on which patents have not yet issued to him. The authorities, also, we think, necessarily sustain the power of the circuit court to annul "the lists of selections" in favor of the state, even if they had not been stricken with nullity by the secretary of the interior and his subordinates of the land department. We can, therefore, see no force in the assignments under consideration, and proceed to the others.

We take up the twenty-first assignment, and will conclude with the twentieth after disposing of it. The error complained of in the twenty-first is that the court erred in dismissing plaintiff's petition as to the Canal & Banking Company, on the ground that it had been proved the bank had, before the institution of the suit, sold and conveyed all the property involved, and that it was not then in possession of the same. We see no error in this action of the court. If the evidence satisfied the court of such facts, then, under the laws of Louisiana and the practice in an action of ejectment, it was equivalent to finding that a mistake had been made in bringing the action against the bank in the first instance. We refer to what we have previously said as to the action of ejectment in the federal courts, and the laws and practice controlling same. The assignment proceeds on the assumption that it had been proved that the banking company, at the time of the institution of the suit, was not only without title to any of the lands claimed of it, but was not in possession, and, on the contrary, had sold all of said property. Assuming these things to be true, we can see no error in the court's dismissal of the case as to that defendant.

We pass to the last assignment, No. 20, which presents the broad question whether the circuit judge erred in taking the issues of fact from the jury, and directing a verdict in favor of defendants and against the plaintiff. The evidence, documentary and otherwise, administered in the circuit court and presented in the ponderous transcript in this case, on the part of defendants, and the documents, surveys, maps, etc., sent up in the original, so far as we have been able to examine them, seem to be in the main one-sided, and not to have been contradicted or varied by any proof administered on the part of the plaintiff. Considering the remote date at which the transactions took place constituting the titles of all the defendants, the loss of records by conflagrations, and death of ancient witnesses, we are free to say that evidence of the existence, validity, and loca-

tion of all the foreign grants to which any of the defendants have traced title, both documentary and oral, has been, in matters of force and conclusiveness, greater than is usually met with in trials of this nature. The importance of the issues involved, the great value of the properties at stake, the long duration and stubbornness with which the proceedings, both before the land department and in the courts, have been conducted, and the remarkable industry of the respective parties in getting their proof, is accountable for this. We think, with the circuit judge, that if the proceedings in the land department were to be given full force and effect, there was, without going further, little left of the plaintiff's case. It depended, as we have endeavored to point out, upon his ability to show that the lands involved (at least, after the elimination from the case of the cemetery and riding-park lands) were public lands of the United States in 1849 and 1850, and as such passed by the swamp-land grants of those years to the state of Louisiana, under whose patents and inchoate titles he claimed. Failing in this, it is our view that the defendants were entitled to judgment, even without showing title in themselves or possession. We seek in vain through the record for any testimony, documentary or otherwise, administered by the plaintiff, seriously contradicting the material proof as administered by the defendants, the controlling character of which led the circuit judge, who must have given it closer attention than we have been able to bestow upon it, to take the case from the jury and direct the verdict he deemed just. In the absence of such contradictory proof, we fail to see how the circuit judge could have done otherwise. In Schofield v. Railway Co., 114 U. S. 618, 5 Sup. Ct. 1127, the supreme court laid down the general rule on this subject as follows:

"It is a settled law of this court that, when evidence given at a trial, with all the inferences which the jury could justifiably draw from it, is insufficient to support a verdict for plaintiffs, so that such verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant,"—citing the following authorities: Improvement Co. v. Munson, 14 Wall. 442; Pleasants v. Fant, 22 Wall. 116; Herbert v. Butler, 97 U. S. 319; Bowditch v. Boston, 101 U. S. 16; Griggs v. Houston, 104 U. S. 553; Randall v. Railroad Co., 109 U. S. 478, 3 Sup. Ct. 322; Commissioners v. Beal, 113 U. S. 227, 5 Sup. Ct. 433; Baylis v. Insurance Co., 113 U. S. 316, 5 Sup. Ct. 494.

Some of the proofs administered by the plaintiff, instead of contradicting that of the defendants, on close examination are found rather to make for the defendants. Reference is here made to the copy of the special instructions to Sulakowski, dated June 7, 1871, under which he made his survey, introduced by the plaintiff. These instructions, found on pages 493 and 496 of the printed transcript, show that it was the duty of Sulakowski to have surveyed the grants as such, instead of surveying them as public lands, and that the records of the surveyor general and of the land office, both in New Orleans, and within his reach, contained in large measure evidence of the existence and location of the grants, and that they were situated within his field of operations.

An effort was made by the plaintiff, in his argument before this court, to show that the true situation of the grants to Le Breton

was further up the Mississippi river than the surveys of Pilie and Grandjean represent them to be; and this on the ground that the decretal part of the grant of 1757 states that the plantation of the petitioner, of 32 arpents front on the river, in the immediate rear of which both the grants were to be situated, was about 2 leagues distant above and on the same side with the city of New Orleans. The petition for the grant states the distance at about 2¼ leagues. The league here meant was certainly the French league, a lineal measure of use in the province in measuring long distances. From the report of the commissioner of the general land office for the year 1869 (page 406) it appears, from a table of comparative French and American measures there given, that the French league was equal to 84 lineal arpents, or 245 of Gunter's chains. As the arpent was about 64 English yards, the league meant would have been about 5,376 yards, and the 2 or 2¼ leagues about 10,752 yards or 12,140 yards, respectively. As the total of these distances amounts to not quite 7 miles, and it was assumed that the present distance by the river was much greater, therefore the contention was that the true position of the grants, as shown by the instruments themselves, should be further up the river. If this argument was worth anything, the very reverse of this proposition would be the case. But the ready reply to all inferences drawn from this assumption is that we do not know whether the straight distance through was meant, or the distance along the bend of the river; nor do we know from what point in the city, nor to what point of the front of the plantation, it was to be taken; nor can we assume that, if the distance by the river was meant, it is the same now, or anything near the same, as it was 140 years ago. The argument, if sound, would upset, not only the survey of Trudeau, made contemporaneously with the grants themselves, and the surveys of Pilie and Grandjean, but also that part of the Sulakowski survey locating the claims of the various persons deraigning title under Almonaster, whose claims were confirmed, as we have seen, in 1835 and 1836. Thus, the theory, if good, would impeach the very survey under which plaintiff claims. It is doubtful if Spain or France, at that early date, ever made two grants whose calls for boundary were more specific and unmistakable, and in the survey of which there is so little room for discretion and doubt on the part of the surveyor. The triangular-shaped tract, beginning 40 arpents from the river and immediately in the rear of the 32-arpents tract on the river, was to be bounded, above and below, by the extension of its "limits," until they extended to the southern boundary of the Vacherie tract. By "limits" or the "lines of the limits," the side lines were meant, as distinguished from the front and rear lines. The calls for boundary, as to the rectangular tract, also granted by the patent of 1757, and regranted in 1764, were even more specific. The lake was to be the north boundary, the prior surveys of the grants (40 arpents in depth) fronting on the Bayou St. John were to form the east boundary, the southern one was to be 60 arpents from the lake, and the western one to be 53 or 54 arpents from the eastern, and to run north to the lake. The government surveyors and experts, examined as witnesses in the case,

seem never to have entertained any doubt about how to locate these calls. If the subject were open for a review here, we think there would be no difficulty in sustaining the locations as made by the government. But, as we have heretofore stated, the survey executed by competent officers of the interior department, after the fullest investigation and deliberation, unimpeached, as it is, for fraud, mistake, or ill practice, seems to us to be conclusive, so far as it fixes the locations, boundaries, and contents of the grants.

No effort has been made, so far as we can perceive, here or in the circuit court, to defeat or question the McCarthy grant, the Livaudais grant, or the Jesuit grant, or the sales of parts of it, or to question the surveys or locations of any of them. We therefore place them on the same plane of authority and validity, in defeating the swamp-land grant to the state, as we have shown the Le Breton grants are entitled to. While it is the well-established doctrine in all cases of this character that the plaintiff must recover on the strength of his own title, and not on the weakness of that of the defendant, the plaintiff's brief is wonderfully silent on this subject. Throughout the six printed pages of plaintiff's argument we look in vain for some allegation that the plaintiff had a good title, some explanation of how he could have any standing in court, after the entries, patents, and all proceedings under the survey made by the deputy surveyor in 1872 were canceled and set aside by the land department of the United States, thus destroying any and all basis for the maintenance of his suit. But, notwithstanding this, he turns his back on his own title, and proceeds to attack that of the defendants, alleging, inter alia, that the French grants of October 6, 1757, and February 15, 1764, are of no validity, are insufficient, and were improperly located, and by assignments of error Nos. 4, 5, 6, and 7 contends that the evidence admitted at the trial to prove same was illegal and inadmissible.

In any view of the case, we fail to see how the plaintiff can recover. If we should go beyond the foreign grants, shown to have appropriated as private property the same land conveyed by the state to the plaintiff, even before the existence of the United States as a nation, we would be constrained to sustain the title of the defendants under the laws of prescription they have all pleaded, and in support of which have administered satisfactory proof of long possession and enjoyment under acts translative of property. We think it plain that the judgment of the circuit court should be affirmed, and it is therefore ordered, adjudged, and decreed that the judgment appealed from be, and the same is hereby, affirmed.